**Edwin MALDONADO, Petitioner,**

v.

**John BURGE, Superintendent, Elmira Correctional Facility, Respondent.**

**No. 07 Civ. 5735(RJH).**

United States District Court, S.D. New York.

March 23, 2010.

Richard M. Greenberg, Office of the Appellate Defender, New York, NY, for Petitioner.

## MEMORANDUM OPINION AND ORDER

RICHARD J. HOLWELL, District Judge.

Petitioner Edwin Maldonado objects to Magistrate Judge Katz's Report and Recommendation [17] (the "Report"), which recommended that petitioner's petition for a writ of habeas corpus be denied. Respondent also objects to portions of the Report. After reviewing the record, the Report, and the relevant legal authorities, the Court concludes that petitioner's request for a writ of habeas corpus should be denied.

## BACKGROUND

The background and relevant procedural history are set forth in more detail in the Report, familiarity with which is assumed.

### The Robberies

On May 3, 2002, while German Guzman was stopped at a red light in his taxi in the

Bronx, he felt someone reach into his shirt pocket and take his money. (*See* Trial Tr. Vol. 2, Sept. 11, 2003 ("Tr. B") at 118–19.) Mr. Guzman saw the robber's hand, but not his face. (*Id.* at 120–21.) After the robbery, Mr. Guzman told the officers called to the scene that the robber had worn a yellow jacket and blue jeans and that he believed the robber to be Hispanic. (*Id.* at 130, 132–33, 136–37.)

Melinda Barcene, stopped at the same red light, witnessed the robbery. (Trial Tr. Vol. 1, Sept. 10, 2003 ("Tr. A") at 12–14.) At one point, the robber crossed directly in front of her, and she was able to get a close, unobstructed view of his face. (*Id.* at 28.) A few days later, Ms. Barcene described the robber to Detective Benny Lucchese as a Hispanic male, 5'9 to 5'10 in height, about thirty years old, in need of a haircut, and with a scar on the right side of his mouth. (Tr. B at 169–70; Tr. A at 46–47.) Ms. Barcene also gave a clothing description of the robber that matched Mr. Guzman's. (*Id.*) From this description, and considering the location of the robbery, Detective Lucchese suspected petitioner of the robbery. (*See* Wade Hearing Tr. Vol. 1, Sept. 3, 2003 ("Wade A") at 85–86, 103.) Detective Lucchese compiled a six photo spread consisting of petitioner and five other similarly featured men and showed it to Ms. Barcene. (*Id.* at 88–89.) Ms. Barcene identified petitioner as the man who committed the May 3, 2002 robbery. (*See* Wade Hearing Tr. Vol. 2, Sept. 8, 2003 ("Wade B") at 172.)

On May 21, 2002, a second robbery occurred. Tanya Simpson had paid her taxi fare and was waiting for change when a man approached the driver's window and snatched the money from the driver's front pocket. (Tr. B at 144–46, 149.) The robber then climbed into the taxi beside Ms. Simpson, held a pistol to her head, grabbed a chain from her neck, and took her wallet. (*Id.* at 145, 147.) The robber's unobstructed face was about two feet from Ms. Simpson's face during the robbery. (*Id.* at 150.) The driver never reported the robbery, but Ms. Simpson called 911 shortly after leaving the taxi. (*Id.* at 157–58, 225.) She met with police officers later in the day and described the robber as a light-skinned black or Hispanic male, about 5'7" in height, about thirty years old, weighing about 140 pounds, with a scar next to his mouth, and with black hair in a high "afro" hairstyle. (*Id.* at 158–60.) She also stated that he had been wearing a blue and red jacket, a blue tee shirt and blue jeans. (*Id.*) Ms. Simpson looked through a photo book with approximately seventy photos, including twenty-two Hispanic males, and after about twenty-five minutes, she picked petitioner out of the book. (*See* Wade A at 6–7, 42.)

Later on May 21, 2002, Detective Glenn Godino arrested petitioner, who was wearing a distinctive bright red "Phillies" baseball jacket with a blue collar and trim, a blue tee shirt with a distinctive caption on the front, and blue jeans. An arrest photo was taken. (*See* Wade A at 49; Cunningham Aff. Ex. 1 ("Arrest Photo").) Detective Godino frisked petitioner and searched his person, but did not find any physical evidence linking him to the robberies. (Tr. B at 257–61, 278.) The next day, Detective Godino organized a lineup with petitioner and five other Hispanic males. (Wade A at 16–17.) All of the men were sitting and wore black stocking caps. (*Id.* at 18, 67). A black plastic sheet was placed in front of the men to hide their clothing and thereby avoid undue suggestiveness. (*Id.* at 18, 67, 69.) However, photographs of the lineup reveal that the very tops of the men's shirts could be seen over the black sheet and that a small portion of petitioner's blue shirt was visible. (*See* Pet. Decl. Ex. B ("Lineup Photo").) It appears from the photo that

petitioner's red "Phillies" jacket had been taken off. (*Id.*) Both Ms. Barcene and Ms. Simpson separately picked petitioner out of the lineup as the robber in the incidents they had witnessed. (Wade A at 20–21, 26.)

### The Wade Hearing

On September 3, 4, and 8, 2003, the court held a *Wade* hearing to determine if any of the identification procedures had been unduly suggestive. *See United States v. Wade,* 388 U.S. 218, 232, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). During the hearing, the witnesses described the events as above, but Detective Godino, looking at a complaint report he had not prepared, testified that Ms. Simpson had described the robber as wearing a red shirt, rather than her actual description of him wearing a blue tee shirt under his red "Phillies" jacket. (Wade A at 70.) There was some discussion about whether Ms. Simpson had described a red or blue shirt, during which time the trial judge stated that "[i]f a blue shirt was at any point at all visible during the lineup and the witness has described the fact that a blue shirt was worn during the course of the lineup, that may or may not relate to the suggestibility of the proceeding." (*Id.* at 68–69.) However, Detective Godino affirmed that the report referred to a red shirt. (*Id.* at 71–72.)

At the conclusion of the *Wade* hearing, petitioner's counsel moved to suppress Ms. Barcene's photo-array identification, alleging that the array was tainted because petitioner was allegedly the only person in the photos with a scar. (Wade B at 193–95, 198.) The court rejected that motion, stating that the procedure was "eminently fair" and that all the photos showed men who looked very similar. (*Id.* at 204.)

### The Trial

Petitioner's trial began on September 8, 2003. The prosecution called four wit-

nesses-Ms. Barcene, Mr. Guzman, Ms. Simpson, and Detective Godino-and relied heavily on the eyewitness testimony of Ms. Barcene and Ms. Simpson's. Report at 13. Both women testified that they had a clear look at the robber's face and both made in-court identifications. (Tr. A at 16–18; Tr. B at 145–46, 150.) Ms. Simpson testified that the robber wore a blue shirt during the robbery, and that she had previously described the shirt as blue, not red-testimony that clearly called into question the accuracy of the report that Detective Godino had referred to during the *Wade* hearing. (*See* Tr. B at 159–61, 178–79.) Ms. Simpson positively identified the arrest photo of the defendant, which she was shown for the first time at trial. (*See* Tr. B at 161–64.) Ms. Simpson then testified about the lineup where she had identified the defendant the day after the attack. She testified that during the lineup, all the men were covered up to their necks by a black plastic bag and that they were all wearing black hats. (*Id.* at 167–68.) Ms. Simpson did not mention that the tops of the men's shirts were visible over the black sheet and was not asked whether she had noticed this fact. (*See id.*)

Petitioner's trial counsel did not call any of its own witnesses, but relied on cross-examination of the prosecution's witnesses and a theory of misidentification. (*See* Report at 14.) Counsel pointed to inconsistencies in witnesses' testimony, and argued to the jury that the identification procedures were unfairly suggestive because petitioner was the only one wearing a blue shirt in the lineup and the top of the shirt was visible over the plastic sheets. (*See id.;* Tr. B at 361–77.)

At the conclusion of the trial, petitioner was convicted of two counts of robbery in the first degree for the May 3, 2002 robbery, and one count of robbery in the third degree for the May 21, 2002 robbery.

Thereafter, petitioner's counsel moved to set aside the two guilty verdicts, partly due to the alleged suggestiveness of petitioner's visible blue shirt at the lineup. (*See* Sentencing Hearing Tr. at 12.) The court denied the motion. (*Id.* at 13.) Petitioner was sentenced as a second violent felony offender to two concurrent terms of twenty-five years and one concurrent term of three and one-half to seven years of imprisonment, and to five years of post-release supervision. (Report at 15.)

### Petitioner's' Direct Appeal

Petitioner then appealed on numerous grounds, represented by counsel from the Office of the Appellate Defender. (*See* Report at 16.) As is relevant to the present petition, petitioner contended, among other things, that his Sixth Amendment right to the effective assistance of counsel had been violated because his trial counsel failed to move to reopen the *Wade* hearing, as is permitted under N.Y.Crim. Proc. Law. § 710.40(4), after learning that Ms. Simpson described the robber's shirt as blue, not red. The Supreme Court, Appellate Division adjudicated the appeal on the merits and found that petitioner had not been deprived of effective assistance. *People v. Maldonado,* 25 A.D.3d 423, 423–24, 807 N.Y.S.2d 87 (App.Div.2006). Petitioner sought leave to appeal to Court of Appeals, but that application was denied. *See id., lv. denied* 6 N.Y.3d 836, 814 N.Y.S.2d 84, 847 N.E.2d 381 (2006).

### Petition for Habeas Corpus

Petitioner then brought the present petition for habeas corpus, reiterating his claim that his Sixth Amendment right to the effective assistance of counsel had been violated because his trial counsel failed to move to reopen the *Wade* hearing after learning that Ms. Simpson described the robber's shirt as blue, not red. Petitioner contends that a reopened *Wade* hearing may have resulted in the suppression of Ms. Simpson's lineup identification as unduly suggestive, which in turn would taint her in-court identification, which in turn would have led to a reasonable probability of a different verdict on the May 21, 2002 robbery charge because Ms. Simpson's testimony was the prosecution's only evidence with respect to that robbery. (*See* Mem. in Supp. of Petition for Habeas Corpus at 29–31; Petitioner's Objections to the Report ("P. Objections") at 7, 10, 12.) The parties agree that petitioner has exhausted his remedies and that the petition is timely.

The petition was referred to Magistrate Judge Katz, who issued his Report on November 7, 2008. The Report recommended that the petition be denied because petitioner had not established that the Appellate Division's decision was contrary to or involved an unreasonable application of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as would be required in order for a writ to lie under 28 U.S.C. § 2254(d) of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Report at 33. In the course of reaching that conclusion, Judge Katz independently analyzed whether petitioner had met his burden of satisfying the two-part test set by *Strickland,* which requires a defendant seeking to establish ineffective assistance of counsel to prove: (i) that counsel's representation fell below an objective standard of reasonableness (the "performance prong"); and (ii) that the deficient performance prejudiced the defense (the "prejudice prong"). 466 U.S. at 687, 104 S.Ct. 2052. With respect to the performance prong, Judge Katz noted that it was plausible that counsel viewed any attempt to reopen the *Wade* hearing as "futile," but ultimately found that he could not conclude that counsel's failure to move to reopen the *Wade* hearing was professionally reasonable.

Report at 24, 26. However, Judge Katz held that petitioner's ineffective assistance of counsel claim failed under the prejudice prong because petitioner had not demonstrated that there was a reasonable probability that he would have succeeded in suppressing the identification had the *Wade* hearing been reopened, and therefore could not show that there was a reasonable probability that the outcome of the trial would have been different but for counsel's errors. *Id.* at 26, 31–32.[1]

Both petitioner and respondent filed objections to the Report. Petitioner contends that Judge Katz applied an erroneous legal standard in reviewing petitioner's claims for ineffective assistance of counsel. In the alternative, petitioner contends that even if Judge Katz applied the correct legal standard, that standard was satisfied because there is a reasonable probability that the lineup identification would have been suppressed at a reopened hearing. (P. Objections at 10–12.). Respondent objects to Judge Katz's finding that petitioner's counsel's performance may have been professionally unreasonable, but agrees with his conclusion that even if it was, petitioner was not prejudiced in any way. (Respondent's Objections to the Report at 2.)

### DISCUSSION

■ Where objections are made to portions of a report and recommendation by a Magistrate Judge, a district court is required to make a *de novo* determination regarding those portions of the report to which objections are made, 28 U.S.C. § 636(b)(1)(C), by reviewing the Report, the record, applicable legal authorities, and the parties' objections and replies. *See Bandhan v. Lab. Corp. of Am.,* 234

F.Supp.2d 313, 316 (S.D.N.Y.2002). The court may then accept, reject, or modify in whole or in part recommendations of the Magistrate Judge. *Id.* (citations omitted).

### I. Standard of Review of State Court's Decision Under AEDPA

■ Under AEDPA, there are three sets of circumstances under which a federal court may grant a writ of habeas corpus to a state prisoner: (i) if the state court's denial of relief "resulted in a decision that was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States;" (ii) if the state court's denial of relief "resulted in a decision that ... involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States;" or (iii) if the state court's denial of relief "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state court decision. *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Leslie v. Artuz,* 230 F.3d 25, 32 (2d Cir.2000).

■ A state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a materially indistinguishable set of facts. *Williams,* 529 U.S.

---

1. The Report further recommended that no certificate of appealability be issued and that the court certify, pursuant to 28 U.S.C.

§ 1915(a)(3), that any appeal from its order would not be taken in good faith. *Id.* at 34

at 405, 120 S.Ct. 1495. The "unreasonable application of federal law" clause is independent of the "contrary to" standard and means more than simply an erroneous or incorrect application of federal law. *See id.* at 411, 120 S.Ct. 1495; *see also Henry v. Poole*, 409 F.3d 48, 68 (2d Cir.2005). Under this clause, a federal court may grant a writ of habeas corpus "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495; *see also Henry*, 409 F.3d at 68. A federal court reviewing a habeas petition "may permissibly conclude that the federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable." *Henry*, 409 F.3d at 68 (citing *Williams*, 529 U.S. at 409, 120 S.Ct. 1495). Ultimately, the inquiry is whether the state court's application was "objectively unreasonable," *Williams*, 529 U.S. at 409, 120 S.Ct. 1495, a standard that falls "somewhere between merely erroneous and unreasonable to all jurists." *Henry*, 409 F.3d at 68 (internal quotation marks and citation omitted).

As noted above, the third potential basis for granting a writ of habeas corpus under AEDPA is if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented ..." 28 U.S.C. § 2254(d)(2). In this case, the Appellate Division did not premise its decision to deny petitioner's' ineffective assistance of counsel claims on any purely factual findings, nor has petitioner argued that he is entitled to habeas relief on this

basis. (*See* P. Objections at 31.) Thus, 28 § 2254(d)(2) is not applicable and will not be discussed further.[2]

The preceding discussion makes clear that the standard of review set by AEDPA for the present petition is deferential. This Court is not being called upon to determine whether the state court correctly rejected petitioner's ineffective assistance of counsel claim. *See Williams*, 529 U.S. at 410, 120 S.Ct. 1495. Rather, this Court's task is simply to determine whether the state court's rejection of petitioner's Sixth Amendment ineffective assistance of counsel claim was contrary to or involved an unreasonable application of clearly established federal law (as defined above).

## II. Petitioner's Request for a Writ of Habeas Corpus

### a. Clearly Established Federal Law

 The petition before this Court raises a Sixth Amendment ineffective assistance of counsel claim premised upon counsel's failure to move to reopen a *Wade* hearing to suppress an out-of-court identification that is alleged to have been unduly suggestive. Under AEDPA, the threshold question is whether the claim is governed by any applicable clearly established federal law. Here, it is. Ineffective assistance of counsel claims are "squarely governed by [the Supreme Court's] holding in *Strickland v. Washington*." *Williams*, 529 U.S. at 390, 120 S.Ct. 1495. As noted, the Supreme Court established therein a two-prong test to determine whether a defendant's Sixth Amendment right to effective counsel has been violated.

---

**2.** The Appellate Division did conclude that petitioner's blue shirt was not so distinctive as to draw attention to defendant in the lineup. *Maldonado*, 25 A.D.3d at 424, 807 N.Y.S.2d 87. However, this conclusion is more appropriately viewed as a mixed question of fact and law, and the reasonableness of that conclusion will be addressed below. Even if it is considered to be factual determination, the Court would not find it to be unreasonable in light of all the evidence.

■ Under the performance prong of *Strickland*, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. 2052. In determining whether counsel's performance fell below an objective standard of reasonableness, "a court must bear in mind both that counsel 'has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process,' and that counsel must have 'wide latitude' in making tactical decisions." *Henry*, 409 F.3d at 63 (quoting *Strickland*, 466 U.S. at 688, 689, 104 S.Ct. 2052). Thus, the court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

Under the prejudice prong of *Strickland*, petitioner must prove that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Thus, "[i]t is not enough to show only that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. 2052. On the other hand, it is not necessary to establish that the outcome of the case "more likely than not" would have been different. *Id.*

While it is undisputed that *Strickland* applies to the present petition—and to all Sixth Amendment ineffective assistance of counsel claims—it is not clear precisely how the general standards articulated therein apply to a fact pattern like the one before this Court, in which the ineffective assistance of counsel claim is premised on a failure to make a suppression motion. The Supreme Court's decision in *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), provides some guidance regarding the application of *Strickland* in this context, but as the discussion below will show, that guidance is incomplete. In *Kimmelman*, the Supreme Court held that where an ineffective assistance of counsel claim is premised on counsel's failure to make a suppression motion, to satisfy the prejudice prong of *Strickland* the petitioner must prove that the underlying suppression claim was "meritorious" and that "there is a reasonable probability that the verdict would have been different absent the excludable evidence . . ." *Id.* at 375, 106 S.Ct. 2574.[3] The requirement that the underlying suppression motion be "meritorious" was articulated in *Kimmelman* as being relevant to the prejudice prong of *Strickland*, but it is also relevant to the performance prong in that counsel's failure to make a suppression motion that is obviously non-meritorious cannot be said to constitute deficient performance. *See Worthington v. United States*, 726 F.2d 1089, 1093–94 (6th Cir. 1984) (Contie, concurring) ("[W]here a suppression motion would be successful, an attorney is guilty of ineffective assistance if he does not file the motion on time . . .

---

**3.** *Kimmelman* itself involved an ineffective assistance of counsel claim based on counsel's failure to move to suppress evidence alleged to have been seized in violation of the Fourth Amendment, but courts have also applied *Kimmelman* to motions to suppress identifications alleged to have been unduly suggestive. *See, e.g., Thomas v. Varner*, 428 F.3d 491, 501–503 (3d Cir.2005); *Hughes v. Hubbard*, No. 99–56436, 2000 WL 1728113 at *1 (9th Cir.2000); *but see Lynn v. Bliden*, 443 F.3d 238 (2d Cir.2006) (analyzing ineffective assistance of counsel claim premised on failure to move to suppress identification without mentioning *Kimmelman*).

Conversely, if such a motion would fail, counsel may not be criticized for having accurately assessed his client's chances of successfully challenging the warrant ...").

The problem posed by *Kimmelman* is that the Supreme Court did not define "meritorious" and has not done so since then, which has led to some confusion regarding the precise meaning of the rule articulated by that decision. Petitioner contends that a suppression claim is "meritorious" under *Kimmelman* if it is "colorable, viable, has quality, or is substantial"—in other words, if it "has merit and is therefore potentially successful"—and faults Judge Katz for failing to employ this interpretation of *Kimmelman* in the Report. (P. Objections at 3–4, 9.) Thus, petitioner argues that the prejudice prong of *Strickland* is satisfied if he can show that the suppression motion is potentially successful and that if the suppression motion had succeeded, there is a reasonable probability the outcome of the trial would have been different. (*Id.* at 9.) The Court, however, concludes that petitioner's interpretation of the term "meritorious" appears overly broad and, in any event, certainly does not qualify as clearly established federal law within the meaning of AEDPA.

While the Supreme Court never defined what it meant by "meritorious," a complete reading of *Kimmelman* suggests that, at minimum, the Supreme Court intended to set out a higher standard than the standard petitioner urges upon the court. In *Kimmelman,* the respondent brought an ineffective assistance of counsel claim based on his counsel's failure to move to suppress physical evidence alleged to have been seized from his bedroom without a warrant. 477 U.S. at 368–69, 106 S.Ct. 2574. Such a suppression claim would likely have been considered colorable since warrantless searches of the home are generally unconstitutional unless an exception applies. Yet the respondent was not able to prevail on his ineffective assistance of counsel claim simply by alleging that counsel failed to make the suppression claim. Instead, the Supreme Court remanded the case to the trial court to further develop the record with respect to the prejudice prong of *Strickland,* in part because the state had not conceded the illegality of the search and no hearing had been held on the underlying merits of the Fourth Amendment claim. *Id.* at 390–91, 106 S.Ct. 2574. The fact that the Supreme Court remanded for further proceedings suggests that the Supreme Court did not mean to imply that a "meritorious" suppression motion is one that is merely colorable, or that the prejudice prong of *Strickland* is satisfied whenever a party raises a colorable suppression claim (and can show that if suppression had resulted, there is a reasonable probability that the outcome of the proceeding would have been different).

The circuit courts have advanced a few different interpretations of *Kimmelman's* statement that petitioner must have a "meritorious" suppression motion in order to satisfy the prejudice prong of *Strickland.* Several courts have stated or implied that a "meritorious" suppression motion is one that *would* succeed if made.[4]

4. *See, e.g., Young v. Renico,* 346 Fed.Appx. 53, 56–59 (6th Cir.2009) (analyzing the merits of petitioner's Fourth Amendment claim in depth and concluding that it would not have prevailed and therefore could not form the basis of an ineffective assistance claim); *Mosby v. Senkowski,* 470 F.3d 515, 519–21 & n. 3 (2d Cir.2006) (analyzing the merits of the suppression claim in a way that suggests that the court interpreted "meritorious" to mean that the suppression claim would actually succeed); *United States v. Romero–Gallardo,* 113 Fed.Appx. 351, 353 n. 1 (10th Cir.2004) ("Our examination of these documents does not convince us that the affidavit fails to establish probable cause. It is by no means

Other courts have stated or implied that to satisfy *Kimmelman,* a petitioner must show that it is *likely* that the suppression motion would have succeeded, or that there is a *reasonable probability* that the suppression motion would have succeeded.[5]

The Court is not aware of any circuit court to have reached the conclusion advanced by petitioner that in order for a suppression claim to be "meritorious" under *Kimmelman,* it need only be colorable or have some potential for success. The Second Circuit cases cited by petitioner do not so hold. Petitioner relies heavily on the Second Circuit's statement in *Lynn v.*

*Bliden,* 443 F.3d 238, 249 (2d Cir.2006), that "[i]n prior habeas cases in which there were claims of ineffective assistance of counsel for failing to request a *Wade* hearing, this Court has demanded some showing of the likelihood of success at the hearing." Petitioner contends that this language makes clear that he only needs to show that "there is at least a colorable or viable ground for suppression" (and a reasonable probability that the verdict would be different if the lineup had been suppressed) in order to prevail on the present petition. (P. Objections at 6). However, the excerpted statement from *Lynn* must be read in the context of the Court's hold-

---

evident that Defendant's suppression argument is meritorious-a necessary prerequisite for a successful ineffective-assistance claim under these circumstances."); *Cuevas v. Chrans,* 3 Fed.Appx. 528, 531 (7th Cir.2001) (petitioner "was required to demonstrate both that a suppression motion would have succeeded and that, having succeeded, there exists a reasonable probability that the outcome of his trial would have been different."); *Van Tran v. Lindsey,* 212 F.3d 1143, 1156 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) ("in order to show prejudice when a suppression issue provides the basis for an ineffectiveness claim, the petitioner must show that he would have prevailed on the suppression motion, and that there is a reasonable probability that the successful motion would have affected the outcome"); *United States v. Bland,* 23 F.3d 403, 403 (4th Cir.1994) ("[Petitioner] has failed to show that the evidence at the suppression hearing would have established an improper search. Without a meritorious Fourth Amendment claim, there is no prejudice under *Strickland.*"); *Laaman v. United States,* 973 F.2d 107, 113 (2d Cir.1992) ("Applying [the standard articulated in *Kimmelman* ], it is our view that whether or not Williams had joined in the motion to suppress ... suppression of the evidence ... would not have resulted. In other words, for reasons hereinafter stated, we conclude that petitioners' Fourth Amendment claim is not meritorious."); *United States v. Caggiano,* 899 F.2d 99, 102 (1st Cir.1990), *abrogated on other*

grounds *by Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("[i]f the searches and seizures were valid, then defendant's fourth amendment claim is meritless, and he can show no prejudice from his trial attorney's withdrawal of the suppression motions."); *see also Garcia v. Walsh,* 348 Fed.Appx. 618, 619–21 (2d Cir.2009); *Phillips v. Mitchell,* 187 Fed.Appx. 678, 679 (9th Cir. 2006); *Huynh v. King,* 95 F.3d 1052, 1058 (11th Cir.1996); *United States v. Owens,* 882 F.2d 1493, 1498–1501 & n. 14 (10th Cir. 1989).

5. *See, e.g., Belmontes v. Brown,* 414 F.3d 1094, 1121 (9th Cir.2005), *overruled on other grounds by Ayers v. Belmontes,* 549 U.S. 7, 127 S.Ct. 469, 166 L.Ed.2d 334 (2006) (requiring a "reasonable probability that a motion to suppress would have succeeded and that the suppression ... would have led to a different out-come at the trial"); *Thomas,* 428 F.3d at 502 ("with respect to the prejudice inquiry, Thomas must show that he would likely have prevailed on the suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted"); *United States v. Horne,* 203 F.3d 53, 53 (D.C.Cir.2000) ("[t]he district court correctly held that appellant failed to prove his trial counsel rendered ineffective assistance by failing to move to suppress the contraband recovered from appellant's car. For the reasons stated in the district court's memorandum opinion, appellant has not shown a 'reasonable probability' that a motion to suppress would have been meritorious.").

ing in that case, which rejected an ineffective assistance of counsel claim premised on a failure to request a *Wade* hearing because there was nothing in the record to suggest that had the *Wade* hearing been reopened, the *identification would have been suppressed. Lynn*, 443 F.3d at 249. There is no indication that the Second Circuit in *Lynn* intended to spell out for future litigants precisely how strong the underlying suppression motion must be in order to prevail on an ineffective assistance of counsel claim premised on the failure to make such a motion. Rather, the Court was merely noting that the evidence in that case fell far below any standard that may be relevant because there was no evidence in the record that the identification would have been suppressed had the hearing been reopened.[6]

As this discussion reveals, there is some uncertainty under federal law as to precisely what showing is required to satisfy *Strickland's* prejudice prong where the ineffective assistance of counsel claim is premised on a failure to make a suppression motion. The Supreme Court has made clear that as a threshold matter, the suppression motion must be "meritorious," but it is not entirely clear what "meritorious" means in this context. The weight of the authority and the logic of *Kimmelman* suggest that petitioner must show, at minimum, a reasonable probability that the suppression motion would succeed, and quite possibly that that the suppression motion would in fact succeed. In the end, in light of the incomplete guidance provided by *Kimmelman* and the divergent opinions of the circuit courts, it is probably not possible to treat the rule articulated therein as clearly established federal law and to evaluate the state court's decision against that uncertain standard. At minimum, petitioner's interpretation of *Kimmelman* is not clearly established federal law within the meaning of AEDPA under any analy-

**6.** The other cases cited by Petitioner are similarly unavailing. *Twitty v. Smith*, 614 F.2d 325 (2d Cir.1979) (rejecting ineffective assistance claim for failure to seek *Wade* hearing where there was no basis for questioning the propriety of the out-of-court identification procedure) and *United States v. Daniels*, 558 F.2d 122 (2d Cir.1977) (finding no prejudice from counsel's failure to move to suppress out-of-court identification where there was no basis for questioning the propriety of that identification) are unhelpful to petitioner's case for the same reason that *Lynn* is unhelpful to his case. Neither case articulates a standard for how strong a suppression motion must be in order to form the basis of an ineffective assistance of counsel claim; they merely observe that where there is no evidence that the suppression motion would succeed, an ineffective assistance of counsel claim premised on a failure to raise that suppression motion cannot stand. *Twitty*, 614 F.2d at 333; *Daniels*, 558 F.2d. at 126. Petitioner also relies on *United States v. Matos*, 905 F.2d 30 (2d Cir.1990), which involved an ineffective assistance claim premised on counsel's failure to move to suppress statements alleged to have been unlawfully ob-

tained. In that case, the court concluded after citing *Kimmelman* that there was insufficient evidence in the record for it to determine whether the statements were obtained illegally, the accused having failed to raise the ineffective assistance claim at any point prior to his appeal to the Second Circuit. *Id.* at 32–33. Therefore, the court was unable to determine whether either prong of *Strickland* was satisfied and remanded to the district court for such a determination. *Id.* at 32–33, 35. At no time in *Matos* did the court state that failure to make a suppression claim that was merely colorable, but that would not ultimately succeed, would be enough to sustain an ineffective assistance of counsel claim. Indeed, *Matos*, read as a whole, is arguably consistent with the notion that a suppression motion must be meritorious in the sense that it would actually succeed in order to support an ineffective assistance claim. Finally, *Saltys v. Adams*, 465 F.2d 1023 (2d Cir.1972), which petitioner also cites, is a pre-*Strickland* case that did not endeavor to answer the question of how strong a suppression motion must be in order for a litigant to be prejudiced by his counsel's failure to raise that claim.

sis. Accordingly, the Court will look to the general standards articulated by the Supreme Court in *Strickland*, as that decision continues to provide "sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims." *See Williams*, 529 U.S. at 391, 120 S.Ct. 1495.

#### b. The "Contrary To" Test

■ The Court has no trouble concluding that the Appellate Division's decision was not "contrary to" *Strickland*. The Appellate Division concluded that petitioner was not deprived of effective assistance of counsel under state or federal standards, citing *Strickland* and reasoning that, "[a]lthough petitioner's counsel did not move to reopen the *Wade* hearing upon learning that one of the robbery victims had described defendant as wearing a blue shirt, the same color he wore at a lineup, this did not deprive defendant of effective assistance [because] such a motion would not have resulted in suppression." *See Maldonado*, 25 A.D.3d. at 423–24, 807 N.Y.S.2d 87. This conclusion plainly does not represent a legal conclusion opposite to that reached in *Strickland*; rather, it appears to represent the Appellate Division's application of the prejudice prong of *Strickland* to the facts before it.

#### c. The "Unreasonable Application" Test

■ The Court also finds that the Appellate Division's decision was not an unreasonable application of *Strickland*. While that Appellate Divisions' decision appears to have focused on the prejudice prong of *Strickland*, this Court concludes that petitioner has failed to satisfy the performance prong as well. Although Judge Katz found that "there is no apparent strategic justification for not moving to reopen the *Wade* hearing" and that it

could not "conclude that counsel's failure was professionally reasonable" (Report at 26), this Court respectfully disagrees. Petitioner's trial counsel could reasonably have concluded that moving to suppress the lineup would have been a strategic error. First, trial counsel could reasonably have concluded that the motion to suppress was unlikely to succeed in light of the facts surrounding the lineup procedure and the New York case law on suggestive identifications (*see discussion, infra*), as well as the fact that the trial court had already denied his motion to suppress Ms. Barcene's photo identification. More importantly, petitioner's trial counsel could reasonably have concluded that even if he did manage to convince the trial court to suppress the lineup identification, there was nothing to suggest that Ms. Simpson's earlier photo book identification of petitioner was improper and would have been suppressed; and further that it was highly unlikely that Ms. Simpson's in-court identification would ultimately have been suppressed as tainted by the lineup since Ms. Simpson's prior independent identification of petitioner from the photo book would support the reliability of her in-court identification. *See U.S. v. Douglas*, 525 F.3d 225, 242 (2d Cir.2008) (noting that the central question in determining whether an in-court identification should be suppressed is whether the identification is reliable). Accordingly, the Court finds that it was a reasonable strategy for petitioner's trial counsel to use the fact that petitioner's blue shirt was visible during the lineup as a jury argument—specifically, to buttress his misidentification theory by attempting to raise doubt in the jurors' minds as to whether the police has used fair identification procedures—rather than moving to suppress the identification. Thus, petitioner has failed to establish that his trial counsel's performance was defi-

cient under the performance prong of *Strickland*.

■ Turning to the prejudice prong, petitioner must show that there was a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding (here, the trial) would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Although the Appellate Division's discussion of its reasons for denying petitioner's ineffective assistance of counsel claim was brief, its decision appears to have been premised on a conclusion that petitioner could not satisfy the prejudice prong because reopening the *Wade* hearing "would not have resulted in suppression" of the lineup under New York state law since the "blue shirt was not so distinctive to draw attention to defendant." [7] *See Maldonado*, 25 A.D.3d. at 424, 807 N.Y.S.2d 87. Obviously, if the suppression motion was denied, the outcome of the trial could not have been different.

■ Petitioner argues that the Appellate Division's conclusion that the suppression motion would not have succeeded was an unreasonable application of *Strickland's* prejudice prong. To the extent that petitioner is arguing that the Appellate Division's underlying analysis of New York law on suggestive identifications was incorrect, that challenge is not cognizable on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States." *Id.*

■ Even if it were cognizable, petitioner would not prevail because the Court cannot conclude that the Appellate Division's application of *Strickland's* prejudice prong was objectively unreasonable. Petitioner argues that there is a reasonable probability that Ms. Simpson's lineup identification would have been suppressed as unduly suggestive because the top of his blue shirt was visible during the lineup, he was the only person in the lineup with a blue shirt, and Ms. Simpson had described him as wearing a blue shirt during the robbery. (P. Objections at 10–12). As Judge Katz aptly noted in the Report, New York courts have found lineups to be improperly suggestive in this context only where defendant's clothing was unusual, figured prominently in the witness' description, or if there was evidence that the witness relied on the clothing to identify the suspect in the lineup. *See* Report at 27–28 (collecting cases). Judge Katz's thorough review of the case law suggests that whether a lineup is unduly suggestive is a fact-specific determination that depends on the totality of the circumstances surrounding the identification. Here, a blue shirt in itself is not particularly distinctive, which undermines a finding of suggestiveness. *See, e.g., People v. Gilbert*, 295 A.D.2d 275, 276, 745 N.Y.S.2d 155 (1st Dep't 2002). And while the blue shirt was one feature of Ms. Simpson's description of petitioner, it could hardly be classified as a "prominent" factor, given that she also described petitioner's skin tone, height, hair style and color, weight, age, the scar next to his mouth, and other items of clothing that he was wearing (including

---

7. The state court "decision" that is subject to review under AEDPA is the state court's result, not its reasoning. *See Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir.2001) ("Although sound reasoning will enhance the likelihood that a state court's ruling will be determined to be a reasonable application of Supreme Court law, deficient reasoning will not preclude AEDPA deference ..." (citations and internal quotation marks omitted)).

a particularly distinctive "Phillies" jacket). When the facts of petitioner's case are considered as a whole, the Court agrees with the Appellate Division and Judge Katz that the lineup was not suggestive (*see Maldonado*, 25 A.D.3d at 423–24, 807 N.Y.S.2d 87; Report at 30). Moreover, regardless whether the Appellate Division's conclusion was correct or not, the Court cannot certainly cannot conclude under the deferential standard of review set by AEDPA that the Appellate Division's judgment on the issue of suggestiveness rendered its application of *Strickland's* prejudice prong objectively unreasonable. *See Williams*, 529 U.S. at 409, 120 S.Ct. 1495.[8]

### III. Certificate of Appealability

■ The Court concludes that petitioner has not made a substantial showing of the denial of a constitutional right, and recommends that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 112 (2d Cir.2000). Although there is some uncertainty under federal law regarding the precise showing

required to make out an ineffective assistance of counsel claim premised on a failure to make a motion to suppress, petitioner has not made a substantial showing that he was denied his Sixth Amendment right to the effective assistance of counsel under any reasonable reading of federal law. In other words, the question whether petitioner was denied his Sixth Amendment right to the effective assistance of counsel is not debatable among jurists of reason and does not deserve encouragement to proceed further. *See id.* Pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

### CONCLUSION

For the reasons stated above, the Court denies the petition for a writ of habeas corpus with prejudice and denies petitioner's request for a certificate of appealability. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

**8.** Petitioner, who has been represented by counsel throughout these proceedings, did not argue in his petition or in his Objections to the Report that the Appellate Division's conclusion that the lineup would not have been suppressed was contrary to or involved an unreasonable application of clearly established federal law regarding the suggestiveness of identification procedures. Accordingly, such a contention is not before the Court. *See Ortiz v. Barkley*, 558 F.Supp.2d 444, 451 (S.D.N.Y.2008) (district courts "generally should not entertain new grounds for relief or additional legal arguments not presented to the magistrate.") Even if such a contention were before the Court, it would not prevail under the deferential standard of review set by AEDPA. The Supreme Court has not set bright line rules governing the circumstances in which lineups are unnecessarily suggestive or the circumstances in which unnecessarily suggestive lineups will be suppressed; rather,

the court has articulated general principles that govern the inquiry, which require nuanced application depending on the circumstances of each case. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 198–99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 113–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Those standards make clear that even if a lineup is found to be suggestive, it does not automatically follow that the identification obtained from it should be suppressed if the identification testimony is nonetheless reliable. *See Neil*, 409 U.S. at 198–99, 93 S.Ct. 375; *Manson*, 432 U.S. at 113–14, 97 S.Ct. 2243. Nothing in the record suggests that the Appellate Division's conclusion that the lineup procedures in this case would not have been suppressed runs afoul of, or is an unreasonable application, the general standards articulated by the Supreme Court.

## REPORT AND RECOMMENDATION

THEODORE H. KATZ, United States Magistrate Judge.

TO: HON. RICHARD J. HOLWELL, United States District Judge.

FROM: THEODORE H. KATZ, United States Magistrate Judge.

Edwin Maldonado ("Petitioner") was convicted on October 23, 2003, of two counts of Robbery in the First Degree (New York Penal Law § 160.15(4)) and one count of Robbery in the Third Degree (New York Penal Law § 160.05), following a jury trial in New York State Supreme Court, Bronx County. He was sentenced as a second violent felony offender to two concurrent, determinate terms of twenty-five years' imprisonment and *one* concurrent, indeterminate term of three-and-one-half to seven years' imprisonment, as well as a five-year term of post-release supervision. The Appellate Division, First Department, affirmed Petitioner's conviction on January 12, 2006. Leave to appeal to the New York Court of Appeals was denied. *See People v. Maldonado,* 25 A.D.3d 423, 807 N.Y.S.2d 87 (1st Dep't), *lv. denied,* 6 N.Y.3d 836, 814 N.Y.S.2d 84, 847 N.E.2d 381 (2006).

Petitioner, now incarcerated in a New York State facility [1], seeks habeas corpus relief, pursuant to 28 U.S.C. § 2254, raising one claim. Petitioner contends that he was denied effective assistance of counsel because his trial attorney failed during trial to move to reopen a *Wade* suppression hearing challenging the identification procedures used in connection with Peti-

tioner's case. (*See* Petition for a Writ of Habeas Corpus, filed June 15, 2007.)

This proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) (2008). For the reasons that follow, the Court recommends that the Petition be denied and the action be dismissed with prejudice.

## BACKGROUND

*The Crimes*

Early in the evening on May 3, 2002, German Guzman was driving his taxi in the Bronx, heading west on 168th Street. (*See* Trial Tr. vol. 2, Sept. 11, 2003 ("Tr. B"), at 118–19.) His window was rolled down, and it was still light outside. (*See id.*) Mr. Guzman stopped at a red light in a row of traffic, and was staring at a building ahead of him when he felt a person's hand reach into the pocket of his shirt. (*See id.* at 119.) Mr. Guzman wrestled with the person briefly; he saw the person's hand, but he never saw the person's face. (*See id.* at 120–21.) During this struggle, Mr. Guzman's taxi lurched forward and collided with the car in front of his. (*See id.* at 120.) Mr. Guzman released the robber's hand, and its owner fled on foot. (*See id.*) Mr. Guzman discovered that the person had taken everything in his shirt pocket, including about $80 or $90. (*See id.* at 121–22.)

Mr. Guzman spoke to police officers at the scene of the robbery and at the police station later that day, and also spoke to Detective Benny Lucchese a few days later. (*See id.* at 122, 135–36.) While Mr. Guzman never saw the face of the person

---

1. The Petition, filed June 15, 2007, states that Petitioner is officially considered an inmate at the Elmira Correctional Facility in Elmira, New York, but that he is a patient at the Central New York Psychiatric Center in Marcy, New York. Respondent's affidavit in re-

sponse to the Petition, filed December 5, 2007, states that, based on information obtained from the website of the New York State Department of Correctional Services, Petitioner *is* incarcerated at the Attica Correctional Facility in Attica, New York.

who robbed him, he reported that the person was a man with short hair and that he wore a yellow jacket and blue jeans. (*See id.* at 130, 132–33, 136–37.) He estimated the man's height at about five feet six inches, and based on the color of the man's hand, Mr. Guzman believed he was Hispanic. (*See id.* at 136–37.)

Melinda Barcene witnessed the robbery of Mr. Guzman from her car. Heading east on 168th Street, Ms. Barcene stopped in a line of traffic at a red light. (*See* Trial Tr. vol. 1, Sept. 11, 2003 ("Tr. A"), at 12.) Mr. Guzman was located to her left, in the opposing lane of traffic, and his car door was no more than two or three steps away from Ms. Barcene. (*See id.* at 12, 14.) When she stopped at the light, Ms. Barcene noticed two men standing on the sidewalk to her right, and watched one of them walk directly in front of her stopped car towards Mr. Guzman's taxi. (*See id.* at 12–14.) Seconds later, upon hearing the sound of brakes, Ms. Barcene turned to her left and saw this man leaning into Mr. Guzman's window and grabbing his shirt. (*See id.* at 15.) She then saw Mr. Guzman's car hit the car in front of his, and watched the man run away. (*See id.* at 16.) Ms. Barcene continued driving home, and she could see the man running in the same general direction. (*See id.* at 27–28, 31.) At one point, the man crossed the street directly in front of Ms. Barcene's car. (*See id.* at 28.) His entire face was visible, and Ms. Barcene obtained another close look at it before she lost sight of the man. (*See id.* at 28–30.) Seeing a roadblock ahead, she stopped and described to a police officer the events that she had witnessed and the direction in which she had last seen the robber running. (*See id.* at 31–32, 62–63.)

On May 6, 2002, Detective Benny Lucchese, who had been assigned to investigate the robbery of Mr. Guzman, interviewed Ms. Barcene by telephone and in person about the robbery she witnessed. (*See* Wade Hearing Tr. vol. 2, Sept. 8, 2003 ("Wade B"), at 169–70.) Ms. Barcene described the robber as an Hispanic male, and stated that he was about five feet nine or ten inches tall, that he needed a haircut, that he had a scar on the right side of his mouth, that he wore a black shirt, blue jeans, and a yellow coat, and that he looked about thirty years old. (*See* Tr. A at 46–47.) Based on Ms. Barcene's description of the man who robbed Mr. Guzman, the location of the robbery, and his knowledge of Petitioner, Detective Lucchese suspected that Petitioner had robbed Mr. Guzman. (*See* Wade Hearing Tr. vol. 1, Sept. 3, 2003 ("Wade A"), at 85–86, 103.) Detective Lucchese compiled a six-person photo spread that he showed to Ms. Barcene at the police station. (*See id.* at 88–89.) The spread included Petitioner and five other men with similar physical characteristics. (*See id.* at 87–89, 110.) After less than a minute, Ms. Barcene identified Petitioner as the man who had robbed Mr. Guzman. (*See* Wade B at 172.)

Two and a half weeks later, on the afternoon of May 21, 2002, Tanya Simpson was riding home in the backseat of a taxi. (*See* Tr. B at 144, 146.) The taxi stopped at a red light at the intersection of 168th Street and Third Avenue in the Bronx. (*See id.* at 145.) Just after Ms. Simpson had paid her fare and received change from the driver, a man approached the taxi's half-open driver's-side window, snatched cash out of the driver's shirt pocket, and reached into the taxi to unlock the doors. (*See id.* at 145, 149.) The man then opened the back door and entered the backseat of the taxi, where Ms. Simpson was sitting. (*See id.* at 145) The man held a black pistol to Ms. Simpson's head, demanded her money and jewelry, and removed a gold chain from her neck. (*See id.* at 147.) During this ordeal, the man's

face was about two feet away from Ms. Simpson's, and there was nothing obstructing her view of it. (See id. at 150.) After Ms. Simpson gave the man her wallet, which contained about $250, credit cards, and identification cards, the man held his gun to the driver's head and demanded his money. (See id, at 147–48.) The driver gave the man money, and the man fled. (See id. at 148, 151.) At this point, the taxi driver asked Ms. Simpson to get out of the taxi, which she did. (See id. at 157.) The taxi driver never reported the robbery. (See id. at 225.)

After Ms. Simpson left the taxi, she walked home and called 911 to report the robbery. (See id. at 157–58.) Later that day, Ms. Simpson spoke to police officers and described the perpetrator to them as a light-skinned black or Hispanic male, about five feet seven inches tall, with a "high and wide" "afro" hairstyle and black hair. (See id. at 158–60.) She also stated that he was wearing a blue and red jacket, a blue shirt, and blue jeans, weighed about 140 pounds, and looked about thirty years old. (See id.) Ms. Simpson later stated that the man had a scar next to his mouth. (See id.)

At the police station, Detective Godino asked Ms. Simpson to examine a photo book to see if she could identify the man who robbed her. (See Wade A at 6–7.) After looking through the book for about twenty to thirty minutes, Ms. Simpson identified Petitioner as the man who had robbed her that afternoon. (See id. at 38.)

*The Arrest and Charges*

Based on Ms. Barcene's and Ms. Simpson's identification of Petitioner, Detective Glenn Godino arrested Petitioner outside his residence, on May 21, 2002. (See Tr. B at 269.) As his arrest photo reflects, Petitioner was wearing a red and blue jacket and a blue shirt at the time of his arrest. (See id. at 160, 162–64.) At the time of his arrest, Petitioner was 31 years old, and he reported his height as five feet eleven inches and his weight as 165 pounds. (See id. at 240.) Detective Godino frisked Petitioner upon his arrest, and detectives conducted a more extensive search of Petitioner's person after he was brought to the police station, but neither search yielded any physical evidence linking Petitioner to the robberies. (See id. at 257–61, 278.)

On May 22, the day after Petitioner's arrest, Detective Godino organized a lineup that included Petitioner and five Hispanic males. (See Wade A at 16–17.) At Petitioner's request, all of the men in the lineup wore hats. (See id. at 18, 67.) Also, black plastic sheets were placed over the men, from the neck down, to cover their clothing, though the tops of their shirts were visible. (See id. at 18, 67, 69.) Based on a photograph that Detective Godino took at the time of the lineup, the top of Petitioner's blue shirt is visible, as are the tops of the other five participants' shirts. (See Exhibit B, "Lineup Photo," Exhibits in Support of Petition for Writ of Habeas Corpus.) Ms. Barcene and Ms. Simpson separately viewed the lineup, and both identified Petitioner as the perpetrator of the respective robberies that they witnessed. (See Wade A at 20–21, 26.)

*The Wade Hearing*

On September 3, 4, and 8, 2003, the trial court held a *Wade* suppression hearing to determine whether the procedures used to identify Petitioner were unduly suggestive. See United States v. Wade, 388 U.S. 218, 232, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (holding that a post-indictment lineup is a critical stage requiring counsel's presence).

The prosecution called Detectives Godino and Lucchese to testify at the hearing about the identification procedures used in the investigation of the robberies. The

defense called Melinda Barcene to discuss the photo array she viewed on May 6, in which she identified Petitioner.

Detective Godino testified that, as described above, Tanya Simpson identified Petitioner, in a photo book on May 21, as the man who had robbed her earlier that day. (*See* Wade A at 6–7, 14.) Detective Godino also testified about the May 22 lineup, which he organized. He stated that Petitioner selected position number four, that fillers occupied the other five seats, and that, at Petitioner's request, all the participants in the lineup were given hats to wear. (*See id.* at 17, 67.) He also stated that he covered all the participants up to their necks with black plastic sheets, as was customary practice, to reduce the possibility of suggestiveness. (*See id.* at 67.) He testified that Ms. Barcene viewed the lineup first, and that after one or two minutes she identified Petitioner as the man who committed the May 3 robbery. (*See id.* at 60.) He stated that Ms. Simpson then viewed the lineup, and that after about ten minutes she identified Petitioner as the man who had robbed her on May 21. (*See id.*)

During cross-examination of Detective Godino, defense counsel inquired as to the particular physical and racial characteristics of the people in the photo book in which Ms. Simpson identified Petitioner. (*See id.* at 39–43.) Detective Godino examined the book and found that twenty-two of the seventy people in the book were Hispanic males. (*See id.* at 43.) He further testified that he called Ms. Simpson after Petitioner was arrested and asked her to come to the precinct to view a lineup, and told her that the man she had identified in the photo book was in custody. (*See id.* at 50.)

The most significant part of the hearing for the purposes of Petitioner's current claim involves Detective Godino's comments about the color of Petitioner's shirt at his arrest and at the lineup. At the hearing, Detective Godino testified that Petitioner wore a blue shirt during the lineup. (*See id.* at 68.) when defense counsel asked whether Ms. Barcene or Ms. Simpson had described the perpetrator as having worn a blue shirt during either robbery, Detective Godino initially said, "I believe so." (*Id.*) The prosecution objected to this line of questioning, but the judge overruled the objection, explaining that "[i]f a blue shirt was at any point at all visible during the lineup and the witness has described the fact that a blue shirt was worn during the course of the lineup, that may or may not relate to the suggestibility of the proceeding." (*Id.* at 68–69.) After looking at a complaint report that he had not prepared himself, Detective Godino stated that Ms. Simpson had reported that the perpetrator had worn a red shirt, not a blue shirt, during the May 21 robbery. (*See id.* at 70.) Detective Godino also stated that Ms. Barcene had reported that the perpetrator had worn a yellow jacket during the May 3 robbery. (*See id.* at 71.) Detective Godino further stated that Petitioner's outer clothing was never visible during the lineup. (*See id.* at 72.) At this point, because there was no apparent argument that Petitioner's clothing tainted the lineup, defense counsel moved on. (*See id.*)

On the second day of the hearing, Detective Lucchese testified that, on May 6, Melinda Barcene came to the precinct to view a photo array that he arranged using a force field machine. (*See id.* at 86, 89.) Detective Lucchese programmed the machine to generate photographs of light skinned male Hispanics in their thirties. (*See id.* at 87.) Because Petitioner "was known to the department, he lived in the vicinity and he fit the description" of the perpetrator, and "he was arrested . . . but

never indicted, for [prior] similar crimes," Detective Lucchese ensured that a photo of Petitioner was in the array of six photographs he showed Ms. Barcene. (*See id.* at 85–86, 104.) Detective Lucchese testified that Ms. Barcene selected the photo of Petitioner and stated that she recognized him from the May 3 robbery. (*See id.* at 89).

On cross-examination, Detective Lucchese testified that, in his interview with Ms. Barcene on May 6, Ms. Barcene had described the perpetrator as having a scar next to his mouth, and that Petitioner was the only person in the photo array with a scar by his mouth. (*See id.* at 102, 114–15.)

At defense counsel's request, the court called Melinda Barcene to testify about her May 6 identification of Petitioner, and her description of the procedure was as described above. (*See id.* at 128–29.)

At the close of the hearing, Petitioner's counsel argued forcefully that the photo identification procedures used with Ms. Barcene, on May 6, were suggestive because Petitioner was the only one of the six individuals shown with a scar on his face. (*See* Wade B at 193–94.) Counsel further argued that Ms. Barcene's subsequent lineup identification should also be suppressed because it was tainted by the photo identification. (*See id.* at 195.) Next, counsel moved to suppress Ms. Simpson's lineup identification of Petitioner on the grounds that it was tainted by prior identification procedures. (*See id.* at 198.)

The trial court rejected defense counsel's motion to suppress, stating:

[w]ith regard to the line-up, first of all I think that it was eminently fair. There were three photographs introduced into evidence and the lineup consisted of young Hispanic men all of whom had some facial hair. They all appeared to be the same height and approximately the same age. In order to reduce any discrepancy or differences in their height or clothing they were all seated and covered with plastic sheets from the neck down and all wore hats. So in my judgment there were no significant differences between them.

(*Id.* at 204.) The trial court further held that the statements made to Ms. Simpson before she viewed the lineup did not render the identification evidence inadmissible, and that Ms. Barcene's photo spread was not suggestive simply because Petitioner was the only person with a large scar. (*See id.* at 205–06.) The trial court explained that "significantly she did testify at cross examination that that scar was not the principal identifying feature of the defendant. She mentioned two other things, his clothing and his hair." (*Id.* at 206.) [2]

The trial began on September 8, 2003, before Justice Edward Davidowitz and a jury.

*The Trial*

The prosecution's case revolved around Ms. Barcene's and Ms. Simpson's eyewitness identifications of Petitioner, as well as Mr. Guzman's description of the May 3 robbery and his limited physical observations of the man who robbed him. The prosecution called four witnesses: Melinda Barcene, German Guzman, Tanya Simpson, and Detective Glenn Godino.

---

**2.** The trial court filed a written decision on the motion on September 26, 2003, after the trial was concluded. (*See* Exhibit C, "Decision and Order of State Trial Court Denying Edwin Maldonado's Motion to Suppress Identification Evidence," Exhibits in Support of Petition for Writ of Habeas Corpus.)

Ms. Barcene testified about the May 3 robbery and her May 22 line-up identification. In particular, she testified that during the two times the man who robbed Mr. Guzman walked in front of the car, she obtained a full view of his face. (*See* Tr. A at 44.) She also stated that there was still substantial daylight when the robbery took place. (*See id.* at 88.)

Mr. Guzman testified about the May 3 robbery and recounted the events as described above.

Ms. Simpson testified about the May 21 robbery and the May 22 lineup. In particular, she testified that she had a good view of the robber's face when he was in the backseat of the taxi with her. (*See* Tr. B at 150.) Ms. Simpson also testified that Petitioner wore a blue shirt during the robbery. (*See id.* at 159–61.) During cross-examination, defense counsel questioned Ms. Simpson further on this issue and confirmed that she had described the man who robbed her as wearing a blue, not red, shirt. (*See id.* at 178–79.)

When the prosecution asked Ms. Simpson how the participants in the May 21 lineup "were dressed," she replied, "black plastic bag covering them to their necks, black hats; they all had on black hats." (*Id.* at 167.) Shortly thereafter, the prosecutor asked, "And they were covered up to their necks?" (*Id.* at 168) Ms. Simpson replied, "Yes." (*Id.*)

Detective Godino testified primarily about Petitioner's arrest and the lineup, recounting the events as described above.

During summation, the prosecution emphasized that Ms. Barcene had obtained very good views of the perpetrator of the May 3 robbery, and that Ms. Simpson had seen the perpetrator of the May 21 robbery up close in the taxi. (*See* Trial Tr. vol. 3, Sept. 15, 2003 ("Tr. C"), at 392–94, 400–01.) The prosecution also argued that the similarities between the May 3 and May 21 robberies, in terms of location, method, and target, should lead the jury to conclude that the same person committed both robberies. (*See id.* at 411–13.)

Petitioner did not call any witnesses and did not testify on his own behalf. Defense counsel relied primarily on cross-examination of the prosecution's witnesses. Specifically, defense counsel focused on inconsistencies in the eyewitnesses' testimony and on possible unfairness in the identification procedures.

During summation, defense counsel argued, that this was a case of mistaken identity and that the government's proof fell well below the required standard. He concentrated on alleged discrepancies in the witnesses' descriptions of the robber and in the witnesses' testimony, and argued that the witnesses were generally unreliable. (*See id.* at 361–77.) He also focused on the lineup and alleged that it was unfair, partly because Petitioner was the only person wearing a blue shirt, Ms. Simpson had described the perpetrator as wearing a blue shirt, and the blue shirt was partly visible above the plastic sheets. (*See id.* at 379.)

*Verdict and Sentencing*

On September 17, 2003, Petitioner was found guilty of two counts of robbery in the first degree for the robberies of Tanya Simpson and the unidentified taxi driver, on May 21, 2002. On September 18, 2003, Petitioner was found guilty of one count of robbery in the third degree for the robbery of German Guzman, on May 3, 2002.

On October 23, 2003, Petitioner was sentenced as a second violent felony offender to two concurrent determinate terms of twenty-five years' imprisonment and one concurrent indeterminate term of three-and-one-half to seven years' imprisonment,

and to five years of post-release supervision.

*Motion to Set Aside the Verdict*

At Petitioner's sentencing hearing on October 23, 2003, Petitioner's counsel moved to Bet aside the two guilty verdicts pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30, arguing that the evidence was legally insufficient to support the verdicts. (*See* Sentencing Hearing Tr. ("S.H."), at 11.) Specifically, counsel argued that the lineup was impermissibly suggestive because Petitioner was the only person at the lineup wearing outerwear of the same color as the outerwear Ms. Simpson described the May 21 perpetrator as wearing. (*See id.* at 12.) Counsel also pointed out alleged discrepancies in the witnesses' physical descriptions of the man who robbed them. (*See id.*) The trial court denied the motion, stating that "the integrity of this verdict does remain intact" and that these concerns were "issues of credibility that were resolved by the jury." (*See id.* at 13.) After the motion was denied. Petitioner's counsel argued forcefully—and successfully—against the government's motion to sentence Petitioner as a persistent felony offender rather than as a second violent felony offender. (*See id.* at 16–23.)

*Petitioner's Direct Appeal*

Petitioner's appellate counsel, Richard M. Greenberg, Esq., of the Office of the Appellate Defender, filed a brief in the Appellate Division, First Department, that raised five issues on Petitioner's behalf. (*See* Defendant–Appellant's Brief, *Maldonado*, 25 A.D.3d at 423, 807 N.Y.S.2d at 87, at Exhibit E, "Appellate Division Briefs," Exhibits in Support of Petition for Writ of Habeas Corpus.)

First, Petitioner argued that the trial court had erred in allowing the prosecution to argue on summation and in issuing an instruction to the jury that, for purposes of

identity, evidence of one crime can be used as evidence of another where the court had held that the two crimes were not unique. As to this claim, the court found that the prosecutor's summation comment and the trial court's jury instructions were proper "in light of the similarities between the crimes." *See Maldonado,* 25 A.D.3d at 423, 807 N.Y.S.2d at 87.

Second, Petitioner argued that he had received ineffective assistance of counsel because he allegedly lacked counsel during the grand jury proceeding and because his counsel filed an allegedly untimely and incomplete motion to dismiss the indictment. The Appellate Division found that these claims did not warrant reversal. *See id.*

Third, Petitioner argued that the trial court abused its discretion by ruling that, if Petitioner chose to testify at trial, the prosecution would be able to question Petitioner about four of his prior convictions involving theft. With respect to this claim, the court found that the trial court's ruling on this matter "balanced the appropriate factors and was a proper exercise of discretion." *See id.*

Fourth, and most importantly for the purposes of this proceeding, Petitioner argued that he had received ineffective assistance of counsel because at trial his lawyer failed to move to reopen the *Wade* hearing after new evidence came to light. With respect to this claim, the court wrote:

> Trial counsel provided effective assistance under the state and federal standards (*see People v. Benevento,* 91 N.Y.2d 708, 713–714, 674 N.Y.S.2d 629, 697 N.E.2d 584 [1998]; *see also Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 [1984] ). Although counsel did not move to reopen the Wade hearing upon learning that one of the robbery victims had described

defendant as wearing a blue shirt, the same color he wore at a lineup, this did not deprive defendant of effective assistance. Such a motion would not have resulted in suppression (*see e.g. People v. Shorter*, 275 A.D.2d 253, 254, 711 N.Y.S.2d 431 [2000], *lv. denied* 95 N.Y.2d 969, 722 N.Y.S.2d 487, 745 N.E.2d 407 [2000] ). The blue shirt was not so distinctive as to draw attention to defendant (*see People v. Santos*, 250 A.D.2d 413, 414, 673 N.Y.S.2d 94 [1998], *lv. denied* 92 N.Y.2d 905, 680 N.Y.S.2d 69, 702 N.E.2d 854 [1998], *cert. denied* 525 U.S. 1076, 119 S.Ct. 815, 142 L.Ed.2d 674 [1999] ); moreover, one of the fillers also wore a blue shirt.

*Id.*

Fifth, Petitioner argued that his sentence was improper and excessive. The Appellate Division declined to review this procedural challenge to Petitioner's sentence, finding it to be unpreserved. The Appellate Division stated, however, that were it to review this claim, it would reject it. *See id.*

The Appellate Division unanimously affirmed Petitioner's conviction on January 12, 2006. *See id.*

On February 13, 2006, Petitioner sought leave to appeal four of the issues raised on direct appeal to the New York Court of Appeals, but, on March 21, 2006, the Court of Appeals denied Petitioner's application for leave to appeal. *See Maldonado*, 6 N.Y.3d at 836, 814 N.Y.S.2d at 84, 847 N.E.2d 381.

## DISCUSSION

Petitioner asserts a claim of ineffective assistance of counsel based on his trial counsel's failure to move to reopen the *Wade* hearing. Petitioner argues that the lineup was suggestive because, during the lineup, petitioner was wearing the same color shirt as the perpetrator of the May 21 robbery was reported to have worn. Petitioner claims that although a black plastic sheet was covering most of his body, his blue shirt was visible above the sheet, and that this tainted Ms. Simpson's identification of him. Petitioner contends that after Ms. Simpson testified at trial that she had described the man who robbed her as wearing a blue shirt, not a red shirt as Detective Godino had stated during the *Wade* hearing, defense counsel should have moved to reopen the hearing. Petitioner argues further that defense counsel's failure to so move was unreasonable and prejudicial, and that the Appellate Division's dismissal of this claim on appeal was unreasonable.

Respondent concedes that the Petition is timely and that Petitioner exhausted his state remedies. Respondent argues that the ineffective assistance of counsel claim raised in the Petition is meritless.

### I. *AEDPA Standard of Review*

Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2008), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Tay-*

*lor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *accord Leslie v. Artuz,* 230 F.3d 25, 32 (2d Cir.2000); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. *See Williams,* 529 U.S. at 412, 120 S.Ct. at 1523; *Leslie,* 230 F.3d at 32.

 "The 'unreasonable application' standard is independent of the 'contrary to' standard," and "means more than simply an 'erroneous' or 'incorrect' application" of federal law. *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir.2005) (citing *Williams,* 529 U.S. at 411, 120 S.Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. *See Williams,* 529 U.S. at 413, 120 S.Ct. at 1523. The Second Circuit has noted that " *Williams* also made clear that a federal habeas court may permissibly conclude that federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable." *Henry,* 409 F.3d at 68. Thus, a court should inquire as to whether the state court's application of federal law was "objectively unreasonable," falling "somewhere between merely erroneous and unreasonable to all jurists." *Id.* (internal quotations omitted).

 Further, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (2008). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." *Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir. 2003). A state court's decision adjudicated on the merits and based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

## II. *Ineffective Assistance of Counsel*

### A. *Legal Standard*

 For the purposes of AEDPA, ineffective assistance of counsel claims are "squarely governed by the Supreme Court's holding in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Williams,* 529 U.S. at 390, 120 S.Ct. at 1511; *accord Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir. 2003). A petitioner must satisfy a two-part test in order to establish that his Sixth Amendment right to effective assistance of counsel has been violated. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064–65; *Henry,* 409 F.3d at 62–63; *LanFranco v. Murray,* 313 F.3d 112, 118 (2d Cir.2002). A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance of counsel prejudiced the defense. *See Henry,* 409 F.3d at 63 (quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2052). Finally, in the habeas context, a petitioner must also show that "the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cox v. Donnelly,* 387 F.3d 193, 197 (2d Cir.2004) (internal quotation marks omitted) (quoting *Bell v. Cone,* 535 U.S. 685, 698–99, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002)).

In applying the first prong of the *Strickland* test. determining the quality of representation, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation and internal quotation marks omitted); *see also United States v. Best,* 219 F.3d 192, 201 (2d Cir. 2000) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks and citations omitted). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Cox,* 387 F.3d at 198; *accord Pavel v. Hollins,* 261 F.3d 210, 218 (2d Cir.2001). A court "must 'make every effort. to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Henry,* 409 F.3d at 63 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065); *see also Cox,* 387 F.3d at 198; *United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir.1987). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 6, 157 L.Ed.2d 1 (2003) (per curiam).

██ Under the prejudice prong of the *Strickland* test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

For the reasons discussed below, the Court concludes that Petitioner's counsel was not ineffective under the *Strickland* standard, and, thus, the state courts did not unreasonably apply the *Strickland* standard in denying Petitioner's claim.

## B. Application of Strickland to Petitioner's Claim

Petitioner claims that counsel was ineffective for failing to move at trial to reopen the *Wade* suppression hearing, after Ms. Simpson testified that the perpetrator of the May 21 robbery, like Petitioner in the lineup, wore a blue shirt. Under N.Y. C.P.L. § 710.40(4), a trial court may permit a defendant to move to reopen a *Wade* hearing "[i]f after a pre-trial determination and denial of the motion the court is satisfied, upon a showing by the defendant, that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion...."

██ It is plausible that counsel viewed an attempt to reopen the hearing and challenge the lineup as futile. "The failure to make demonstrably futile arguments cannot constitute constitutionally ineffective assistance of counsel." *United States v. Reeves,* No. 02 CV 9309(LAP), 96 CR 325, 2005 WL 3288012, at *8, (S.D.N.Y. Dec. 2, 2005). At the actual *Wade* hearing, the trial court rejected all of counsel's attempts to suppress identification evidence, and at least one of counsel's claims—that the photo array and subsequent lineup that Ms. Barcene viewed were suggestive because Petitioner was the only person in the six-person photo array with a scar on his face—was arguably stronger than the claim based on the red shirt-blue shirt issue. (*See* Wade B at 203–06.)

At the same time, the trial court might very well have reopened the *Wade* hearing had defense counsel moved to do so, as Ms. Simpson's testimony at trial—that the

perpetrator was wearing a blue shirt—was an "additional pertinent fact" that had not been discussed at the *Wade* hearing and that probably could not have been discovered by the defendant "with reasonable diligence before the determination of the motion." N.Y. C.P.L. § 710.40(4). The trial court stated during the *Wade* hearing that "[i]f a blue shirt was at any point at all visible during the lineup and the witness has described the fact that a blue shirt was worn during the course of the lineup, that may or may not relate to the suggestibility of the proceeding." (Wade A at 68–69.) This indicated at least some willingness on the part of the trial court to entertain a claim that the lineup was suggestive because Petitioner's blue shirt was visible. Moreover, there is no apparent strategic reason for not moving to reopen the *Wade* hearing. As Petitioner argues, moving to reopen the *Wade* hearing would not have foreclosed defense counsel's argument to the jury regarding suggestiveness. Furthermore, because the evidence with respect to the May 21 robbery was based virtually entirely on Ms. Simpson's testimony, successful suppression of Ms. Simpson's lineup identification of Petitioner would have been extremely beneficial for Petitioner's case.

Because there is no discernible strategic justification for counsel's failure to move to reopen the *Wade* hearing, and because success at such a hearing could have greatly helped Petitioner's case, this Court cannot conclude that counsel's failure was professionally reasonable.

Nonetheless, Petitioner's claim fails on the second *Strickland* prong. To satisfy the second prong of the *Strickland* test, Petitioner must show that the *Wade* claim was meritorious and that a reasonable probability exists that, but for counsel's alleged error in failing to move to reopen

the *Wade* hearing, the outcome of the trial would have been different.

Even if the *Wade* hearing had been reopened, there is not a reasonable probability that Ms. Simpson's lineup identification of Petitioner would have been found suggestive and therefore suppressed. The trial court was unlikely to rule in favor of Petitioner given its rulings at the *Wade* hearing. The trial court rejected counsel's arguments that Ms. Barcene's photo and lineup identifications were suggestive, even though Petitioner was the only person with a scar in the photo array showed to Ms. Barcene, and Ms. Barcene had reported that the perpetrator had a scar. Furthermore, under the law governing identification procedures, the most likely outcome of a reopened *Wade* hearing would have been for the court to rule that Petitioner's clothing did not render the identification unfairly suggestive.

 Under New York case law, which would have governed a reopened *Wade* hearing, a lineup can be improperly suggestive if a suspect is wearing the same type of clothing as the witness described the suspect as wearing, if such clothing is unusual, if it figured prominently in the witness's description, or if there is evidence that the witness relied on the clothing to identify the suspect in the lineup. *See, e.g., People v. Owens,* 74 N.Y.2d 677, 678, 543 N.Y.S.2d 371, 372, 541 N.E.2d 400 (1989) (finding a lineup suggestive because the "defendant was the only person wearing the distinctive clothing—a tan vest and a blue snorkel jacket—which fit the description of the clothing allegedly worn by the perpetrator"); *People v. Riddick,* 251 A.D.2d 517, 518, 674 N.Y.S.2d 703, 704 (2d Dep't 1998) (holding that a lineup was suggestive because the defendant was the only person wearing a striped shirt, and the witness had reported that the defendant wore a striped shirt during the

crime); *People v. Bady,* 202 A.D.2d 440, 440, 608 N.Y.S.2d 679, 679–80 (2d Dep't 1994) (holding that a lineup was suggestive because the defendant was the only person in the lineup wearing a red shirt and. the red shirt had figured prominently in the witness's description of the perpetrator).

Where, however, the clothing at issue does not fit in one of these categories, lineups are not suggestive. For example, in *People v. Gilbert,* 295 A.D.2d 275, 745 N.Y.S.2d 155 (1st Dep't 2002), the defendant challenged an identification because he was the only person in a photo array wearing a brown jacket, and the witness identifying him had described him as wearing a brown leather jacket during the crime. The Appellate Division, First Department, found:

> In any event, although a photographic viewing in which a complainant identifies a defendant may be suggestive where the defendant is the only person in the array wearing particular clothing described by the complainant as having been worn by the perpetrator, where the clothing at issue is not unusual, such as a brown jacket, the identification procedure is not suggestive.

*Gilbert,* 295 A.D.2d at 277, 745 N.Y.S.2d at 157; *see also People v. Tinnen,* 238 A.D.2d 615, 616, 657 N.Y.S.2d 73, 73 (2d Dep't 1997) (holding that a lineup in which the defendant was the only person wearing a red shirt was not suggestive because the

shirt did not figure prominently in the witness's description and because there was no evidence the witness relied on the color of the shirt to identify the defendant); *People v. Santos,* 250 A.D.2d 413, 414, 673 N.Y.S.2d 94, 95 (1st Dep't 1998) (holding that a lineup in which the defendant was the only person wearing a blue shirt was not suggestive because the blue shirt was not "so distinctive as to draw attention" to the defendant and because the witnesses testified that they had concentrated on the defendant's face, not his clothes); *People v. Gega,* 188 A.D.2d 305, 306, 591 N.Y.S.2d 154, 155 (1st Dep't 1992) (holding that a lineup in which the defendant was the only person wearing a leather jacket was not suggestive because the jacket was not unusual or uncommon, because the fillers were wearing jackets of some type, and because the witnesses stated that the leather jacket had not swayed the identification); *People v. Moore,* 193 A.D.2d 627, 627–28, 597 N.Y.S.2d 444, 445 (2d Dep't 1993) (holding that a lineup in which the defendant was the only person wearing visible bandages was not suggestive because there was no evidence the witness relied on the bandages to identify the defendant).[3]

Petitioner's case falls within the *Gilbert* line of cases. The article of clothing .at issue, a blue shirt, is not at all unusual, nor was the blue shirt an outstanding feature of the perpetrator's appearance to Ms.

---

**3.** In a case involving a habeas petition filed by a prisoner convicted in New York State courts, the Second Circuit held in *Raheem v. Kelly,* 257 F.3d 122 (2d Cir.2001) that "[a] lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not. 'Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing

the dangers of misidentification.' (quoting *Israel v. Odom,* 521 F.2d 1370, 1374 (7th Cir. 1975)). For example, where eyeglasses were 'the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police,' a lineup in which the defendant was the only person wearing eyeglasses was unnecessarily suggestive." *Raheem,* 257 F.3d at 134. Under these federal standards, which are essentially the same as New York's, Petitioner's argument for suggestiveness is equally unavailing.

Simpson. Indeed, Ms. Simpson, who saw the perpetrator up close for several minutes, provided a detailed description of the perpetrator's physical characteristics and several items of clothing. Furthermore, Ms. Simpson testified that the perpetrator was wearing a blue and red jacket over a blue shirt when he robbed her; he was not wearing this jacket in the lineup. Also, while the top inch or so of a blue shirt is visible in the close-up photograph of the lineup. Petitioner's clothing was almost entirely obscured by the black sheet, and there is no evidence that Ms. Simpson noticed the blue shirt or based her identification on the shirt. In short, the top inch or two of a blue shirt is not the sort of distinctive clothing that renders a lineup suggestive. This is particularly true given that the witness provided a detailed description of other aspects of the suspect's clothing and appearance, there is no evidence the witness noticed the blue shirt, and the perpetrator was wearing outerwear over the shirt during the crime.

Although the trial court commented during the *Wade* hearing that, if it were the case that the Petitioner was wearing clothes similar to those that the robber was described as wearing, that "might or might not" be suggestive, a closer look at the facts around the identification would almost certainly have led the court to reject a challenge to Ms. Simpson's identification based on suggestiveness. Mere possibility of success is not the same as the reasonable probability of success that the *Strickland* standard requires. Here, Petitioner cannot show that, had the *Wade*

hearing been reopened, there would have been a reasonable probability of success in prevailing on the motion—not to mention in changing Petitioner's guilty verdict, which is the *Strickland* standard.

In denying Petitioner's appeal as it related to the current issue, the Appellate Division wrote:

> Trial counsel provided effective assistance under the state and federal standards [citations omitted]. Although counsel did not move to reopen the *Wade* hearing upon learning that one of the robbery victims had described defendant as wearing a blue shirt, the same color he wore at the lineup, this did not deprive defendant of effective assistance. Such a motion would not have resulted in suppression. [citations omitted.] The blue shirt was not so distinctive as to draw attention to defendant [citations omitted]; moreover, one of the fillers also wore a blue shirt.[4]

*Maldonado*, 25 A.D.3d at 423, 807 N.Y.S.2d at 87. The Appellate Division's disposition further suggests that the outcome of a reopened *Wade* hearing would have been unfavorable to Petitioner. Because Petitioner cannot demonstrate that there was a reasonable probability of success in suppressing the lineup identification, he obviously cannot show that there was a reasonable probability that his trial would have been different had counsel moved to reopen the *Wade* hearing. Thus, Petitioner fails to satisfy the second prong of the *Strickland* test.[5]

---

**4.** While the Appellate Division states that a filler was wearing a blue shirt, this is unclear from the photographs of the lineup, and Petitioner disputes this assertion. In any event, this is irrelevant to the current analysis.

**5.** The court notes that review of the trial record suggests that, apart from counsel's failure to move to reopen the *Wade* hearing,

counsel generally provided effective representation for Petitioner throughout the trial. *See United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984) ("When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of [adversarial] testing envisioned by the Sixth Amendment has occurred."). For example,

In the end, of course, all federal habeas claims based on state court convictions must overcome the high barrier set by AEDPA in order to succeed. Because the Appellate Division's decision was based on the relevant *Strickland* factors, the ultimate question to be resolved here is whether its decision involved an "unreasonable application" of the *Strickland* standard to the facts of Petitioner's case. *See Sellan v. Kuhlman,* 261 F.3d 303, 314–15 & n. 6 (2d Cir.2001). As noted, unreasonable means "objectively unreasonable," *Williams,* 529 U.S. at 409, 120 S. ct. at 1521, which involves "[s]ome increment of incorrectness beyond error." *Sellan,* 261 F.3d at 315 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)); *see also Eze,* 321 F.3d at 124–25.

Even if Petitioner were able to show that counsel's failure to move to reopen the *Wade* hearing amounted to ineffective assistance of counsel, he would also have to show that the Appellate Division's decision to the contrary was an "unreasonable application" of federal law. However, in Petitioner's case, the Appellate Division considered and rejected the merits of Petitioner's claim, weighing the claim according to the federal *Strickland* standard and arriving at a reasonable conclusion based on reasoned analysis. *See Maldonado,* 25 A.D.3d at 423, 807 N.Y.S.2d at 87. Under the deferential AEDPA review standards,

the Court cannot conclude, in light of the facts of this case, that the state court unreasonably applied *Strickland* in determining that Petitioner was afforded effective assistance of counsel.

Accordingly, the Court recommends that Petitioner's ineffective assistance claim be dismissed in its entirety.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued. *See* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 920–21, 8 L.Ed.2d 21 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ.

---

counsel presented a compelling opening statement and summation (*see* Voir Dire, Sept. 8, 2003 ("Voir Dire"), at 303–13 and Tr. C at 358–85), competently questioned witnesses and prospective jurors (*see* Wade A at 29–76, 93–117, Wade B at 173–91, Tr. A at 52–93, Tr. B at 124–40, 170–207, 212–17, 244–78, 285–88, Voir Dire at 110–27, 240–59), fought to suppress identification evidence in the *Wade* hearing (*see* wade B at 193–99), opposed the prosecution's attempt to gain the right to question Petitioner about previous convictions (*see* Wade A at 137–165), and successfully moved for Petitioner to be sentenced as a

second, rather than persistent, felony offender (*see* S.H. at 16–23).

Indeed, during the trial, the trial court responded to Petitioner's occasional complaints about his legal representation by saying, for example, "Mr. Unger is a superb attorney. *He's* asking excellent questions. He knows what he's doing.... His defense is excellent." (Tr. A at 97–98.) Even Petitioner's submissions in this case concede that "counsel had a coherent trial strategy based on misidentification." (*See* Reply Memorandum in Support of Petition for writ of Habeas Corpus, dated Dec. 21, 2007, at 2.)

p. 6(a) and (d) (2008). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Holwell, United States District Judge, and to the chambers of the undersigned. Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Holwell. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 145, 155, 106 S.Ct. 466, 470, 475, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

Respectfully submitted,

Dated: November 6, 2008.

New York, New York.